UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ANGELA K. MAY                    )
       Plaintiff              )
                                 )
  v.                             )        NO. 4:08-CV-77
                                 )        MATTICE/CARTER
MICHAEL J. ASTRUE                )
Commissioner of Social Security  )
       Defendant             )

<u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion for Summary Judgment on the Administrative Record (Doc. 12) and defendant's Motion for Summary Judgment (Doc. 17).

This is an action for judicial review of the final decision of the Commissioner of Social Security (Commissioner) that Plaintiff, Angela May, was not "disabled" under the Social Security Act (Act). 42 U.S.C. §§ 423(d), 1382(c). Plaintiff protectively filed applications for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income[1] (SSI) in January 2005 (Tr. 91-95).[2]

---

[1] It appears that Plaintiff's January, 2005 SSI application was not included in the certified administrative record. However, the omission of this application does not materially affect this case and neither party disputes that Plaintiff filed for SSI.

[2] Plaintiff previously applied for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI) in August 2004 (Tr. 31-35, 96-98). Plaintiff's applications were denied in October 2004 and no further review was initiated (Tr. 81-84).

1

For the reasons stated herein I RECOMMEND the Commissioner's decision be REVERSED and REMANDED under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 41 years old at the time of the Administrative Law Judge's (ALJ's) decision (Tr. 500). Plaintiff had an 11th grade education (Tr. 192). Plaintiff's past work included work as a sewing machine operator (Tr. 170)[3] and work as a care giver for handicapped and elderly individuals (Tr. 126). Plaintiff described her work as a sewing machine operator as involving sitting 8 hours a day and lifting less than 10 pounds (Tr. 172).

## Claim for Benefits

Plaintiff filed her initial applications for Social Security disability insurance benefits and Supplemental Security Income on January 28, 2005 alleging disability as of August 1, 2004 (Tr. 91-95). Plaintiff's applications were initially denied on August 30, 2005 (Tr. 74-78). Her request for reconsideration was denied on December 28, 2005 (Tr. 68-69). The plaintiff filed an untimely request for hearing on March 15, 2006 (Tr. 55). This matter was heard before an ALJ on January 23, 2008. The ALJ found good cause for late filing (Tr. 14). The ALJ ruled, on February 25, 2008, that the plaintiff was not entitled to a period of disability or disability insurance benefits or Supplemental Security Income benefits (Tr. 14-21). Plaintiff filed a request for review of the hearing decision on March 11, 2008 (Tr. 9). The Appeals Council denied Plaintiff's request for review on June 4, 2008 (Tr. 7-8).

---

[3] Plaintiff's 2005 applications did not include her past work as a sewing machine operator. This information was included in her prior application's work history report (Tr. 126, 170, 172).

2

## Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id*. If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Sec'y, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

3

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Sec'y, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since August 1, 2004, the alleged onset date (20 CFR § 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following combined impairments: fibromyalgia, osteoarthritis, chronic obstructive pulmonary disease, asthmatic bronchitis, and obstructive sleep apnea (20 CFR § 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

4

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to frequently carry ten to twenty pounds, stand or walk for four to six hours, and sit six to eight hours of an eight hour workday.  She could occasionally climb, balance, stoop, kneel, crouch, and crawl.

6.  The claimant is capable of performing past relevant work as a sewing machine operator.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2004 through the date of this decision (20 CFR § 404.1520(f) and 416.920(f)).

(Tr. 16-21).

## Issues Raised

(1) Plaintiff argues the ALJ did not properly weigh the opinions of Drs. Watterson and Henson, and

(2) The ALJ erred in concluding Plaintiff's subjective complaints of disabling pain were unsupported by the record.

## Relevant Facts

### Reports and Testimony

In a pain questionnaire dated March 18, 2005, Plaintiff stated her pain is constant, that her back and legs hurt all of the time, her feet hurt too bad to walk most of the time.  Lortab does not completely relieve her pain, and her pain is so intense most of the time that she gets very moody and stays in her room and lies on the bed a lot or in her recliner (Tr. 134, 135). She further stated in a fatigue questionnaire of the same date that her husband helps her put on her shoes and helps her clean, that she forgets what she is doing, and that she sometimes doesn't feel like even getting out of bed (Tr. 138-139). Plaintiff's mother, Carol Green, completed a third party

5

function report on November 15, 2004. Ms. Green reported Plaintiff rests about every 15 minutes, she is up for hours before going to bed, she can only stand or walk for ten minutes before resting about 20-30 minutes before resuming walking, she gets very aggravated with authority figures, and she cries and gets stressed out a lot. She further stated that her daughter's ankle stays swollen a lot (Tr. 152-159).

At the administrative hearing Plaintiff testified she hurts really badly in her neck, legs, arms and hands. When she lies down, her feet are numb (Tr. 507). On a scale of 0-10 her pain level is a ten when she wakes up. Her knees hurt from arthritis with activity (Tr. 509). Her knee pain is a level six. She testified she cut her smoking to one-half pack per day (Tr. 510). She still took two 30-45 minute breathing treatments per day (Tr. 511). Plaintiff testified that she was unable to work due to fibromyalgia, arthritis, chronic obstructive pulmonary disease (COPD), asthma, and sleep apnea (Tr. 505-506). She testified that her disability was solely based on her physical impairments (Tr. 506). Plaintiff testified her fibromyalgia caused a throbbing pain in her neck, legs, arms, and hands, and that she had arthritis in her knees (Tr. 507-509). She indicated that she underwent knee surgery but stated it had not helped with her pain (Tr. 516). She reported that she experienced her worst pain in the morning, and rated it a ten on a ten-point scale (Tr. 508). Plaintiff testified that climbing and walking caused her pain (Tr. 509). She estimated that she could not walk more than ten minutes without having pain (Tr. 510). Further, she estimated that she could only sit for about 30 minutes and stand for about ten minutes before she was in pain (Tr. 513). She testified that her breathing treatments included occasional oxygen and daily treatments of either Albuterol or Alpatropium (Tr. 511-512).

Plaintiff testified to smoking over a half a pack of cigarettes a day, despite medical advice to stop smoking[4] (Tr. 503). Plaintiff indicated that she noticed her breathing had improved when she decreased her smoking (Tr. 511). Plaintiff testified that she was 5'6" tall and weighed 232 pounds and indicated she was not on a diet (Tr. 502). She testified that she would babysit her three year old grandson every once in awhile but only when her husband was at home because she could not keep up with her three year-old grandson (Tr. 520). Also, Plaintiff testified that she enjoyed scrap booking and that she went to church services on Sunday mornings (Tr. 517). Although she goes to church, she usually does not sit through the whole service (Tr. 517). When her husband takes her on a 45-50 minute trip to Nashville to the doctor she stops and gets out of the vehicle for ten minutes before continuing the trip (Tr. 519).

Medical Evidence

Dr. Jerry Surber performed a physical consultative examination at the request of the state Disability Determination Bureau (DDB) on August 3, 2005 (Tr. 446-456). Plaintiff complained of shortness of breath with minimal exertion. Dr. Surber noted there were test results pending including pulmonary function test with a bronchodilator but he had none of the Plaintiff's medical records available for review (Tr. 446). Plaintiff reported that she smoked up to 2 packs of cigarettes a day (Tr. 446). Dr. Surber observed that Plaintiff walked unassisted and with a normal gait (Tr. 452, 455). Plaintiff's lungs were clear to percussion and ausculation (Tr. 448). Dr. Surber observed some audible distant breath sounds, but, otherwise, there were no abnormal breathing sounds (Tr. 448). Plaintiff's abdomen examination was unremarkable (Tr. 454). Plaintiff was tender to palpitations in her dorsolumbar spine, and her shoulders were palpably

_____

[4] Plaintiff testified that she used to smoke two packs a day (Tr. 510).

7

non-tender (Tr. 454). Plaintiff had a full range of motion in her elbows, shoulders, hips, knees, ankles, wrists, hands, and fingers (Tr. 454-455). Plaintiff had normal muscles and joints, with equal upper and lower limb strength and full grip strength (Tr. 455).

Dr. Surber diagnosed shortness of breath on minimal exertion with no chest pain and consistent with ongoing and progressive COPD for which Plaintiff used a home-based nebulizer (Tr. 455). Dr. Surber noted that Plaintiff continued to smoke up to 2 packs of cigarettes a day (Tr. 455). Dr. Surber also diagnosed gastroesophageal reflux disease (GERD) and obstructive sleep apnea (Tr. 456). Dr. Surber also diagnosed morbid obesity – Plaintiff was 5'4" tall and weighed 223 pounds (Tr. 455). Dr. Surber opined that Plaintiff had full functioning in her neck, back, shoulder, hips, legs, feet, arms, and hands (Tr. 450, 456). Based on the patient's physical examination with no medical records available for review, Dr. Surber opined that Plaintiff could frequently lift or carry 10 to 20 pounds, stand and walk 4 to 6 hours in an 8-hour workday, and sit for 6 to 8 hours in an 8-hour workday (Tr. 450, 456).

In August 2005, Dr. Evelyn Davis, a state agency physician, reviewed Plaintiff's records at the request of the DDB (Tr. 434-439). Dr. Davis determined that Plaintiff could lift 50 pounds at a time and could frequently lift or carry objects weighing up to 25 pounds (Tr. 435). Further, Plaintiff could stand and walk for about 6 hours in an 8-hour workday and could sit for about 6 hours in an 8-hour workday (Tr. 435). Dr. Davis noted that her conclusions were different from Plaintiff's treating sources because there were normal clinical findings, such as good ranges of motion and full strength (Tr. 438-439). Dr. Davis also stated that Plaintiff's pulmonary function testing results showed "well above listing" levels (Tr. 438-439). The only comments on that report come directly from the August 3, 2005 report of Dr. Surber (Tr. 446-451 and 452-456) and

8

a single pulmonary function testing report of August 3, 2005 (Tr. 441-445). It does indicate a review of treating physicians notes as of the August, 2005 date.

An x-ray performed on December 8, 2005, showed Plaintiff to have degenerative changes involving the dorsal articulations of the mid foot (Tr. 314).

A routine GI on January 20, 2006, showed Plaintiff to have severe gastroesophageal reflux disease and a small hiatal hernia. Tr. 296. Plaintiff had an upper GI endoscopy on April 6, 2006 because of problems with swallowing and nausea. It showed Plaintiff to have gastritis without hemorrhage (Tr. 280-286). On April 26, 2006, Dr. Maan Anbari reported that he treated Plaintiff for dysphagia, weight loss, lower GI bleeding, and nausea. Dr. Anbari recommended a fiber supplement in addition to her Protonix and Reglan and scheduled a colonoscopy (Tr. 209). Follow-up colonoscopy on August 14, 2006, found Plaintiff to have internal hemorrhoids and polyps (Tr. 224-225).

X-rays of Plaintiff's chest in February of 2006 showed mild degenerative changes in the mid to lower thoracic spine (Tr. 369).

On April 10, 2006, Plaintiff was treated in White County Community Hospital for an anxiety attack (Tr. 275-277).

X-ray of the chest on August 20, 2006, showed moderate degenerative changes involving the mid thoracic segments with bridging anterior osteophytes (Tr. 218).

MRI of the right knee on August 14, 2006, showed intermediate grade patellofemoral chrondomalachia with subchondral erosions more prominent involving the lateral patellar facet and mild tricompartmental degenerative changes (Tr. 226). On August 24, 2006, Dr. John

9

Thompson performed arthroscopic surgery on Plaintiff's right knee for posttraumatic chondromalachia (Tr. 251).

On December 6, 2004, Plaintiff saw Dr. Charles Morgan for a second opinion. Her treating doctor had been treating her for gout and the medicine was not working (Tr. 472). Dr. Morgan recommended referral to a rheumatologist (Tr. 469).

On February 3, 2005, Dr. Morgan noted Plaintiff had sleep disturbances and recommended a sleep study (Tr. 465). On February 21, 2005, a sleep study conducted at River Park Hospital showed moderate obstructive sleep apnea with severe snoring and periodic limb movements (Tr. 474-479).

Plaintiff was treated for fibromyalgia and osteoarthritis by Dr. Michael Watterson for more than 3 years before the administrative hearing (Tr. 326-339, 203-207). On January 10, 2005, Dr. Watterson reported to Dr. Charles Morgan that Plaintiff has a long standing history of joint pain and morning stiffness. His examination showed myofascial tender points particularly on the cervical spine, elbows and lower back. She had bilateral crepitus on both knees. His diagnosis was fibromyalgia and osteoarthritis (Tr. 331-332). On March 11, 2005, Dr. Watterson increased dosages of Elavil and Lortab (Tr. 330). Laboratory testing on July 28, 2005 showed a positive ANA speckled pattern (Tr. 335). On July 28, 2005, Dr. Watterson added Mobic to Plaintiff's medications (Tr. 329). On April 23, 2007 and August 29, 2007, Plaintiff reported low back and knee pain. Dr. Watterson continued his treatment (Tr. 270-271).

On a Medical Source Statement completed on January 10, 2008, Dr. Watterson reported that Plaintiff had limitation of motion in joints, inability to ambulate effectively, and inflammation in both knees and her spine. He reported that she had significant fatigue and

malaise, could stand 15 minutes at a time, sit 15 minutes at a time, work 4 hours per day lifting

10 pounds occasionally, should never bend or stoop, and could occasionally raise her arms above

shoulder level. He based his restrictions primarily on fibromyalgia but indicated that she did have

arthritis in her knees and spine (Tr. 203-205).

Allergy testing for Plaintiff on August 26, 1997, found Plaintiff to be allergic to molds,

weeds, grasses, trees, mites and cockroaches. An allergy desensitizing program was

recommended (Tr. 457-458).

On February 21, 2006, Plaintiff saw Dr. David Henson, M.D. a pulmonary specialist, for

asthma with a cough. She noted daytime tiredness and nighttime snoring and occasional

smothering. A review of systems was significant for night sweats and fatigue, increased thirst,

appetite and fatigue, sinus congestion and sensitivity to dust, pollen, foods,  animals and cigarette

smoke, shortness of breath, sneezing, difficulty sleeping, loud snoring and feeling unrefreshed

with sleep, chest pain, swelling of legs, difficult and painful swallowing, arthritis, muscle aches

and pains, joint aches and pains, muscle cramps, joint swelling, joint stiffness, and difficulty with

stress, anxiety, and depression. Physical examination showed blood pressure 130/90, heart rate

107, decreased breath sounds with a small amount of wheezing, and 1+ bilateral pitting edema in

both lower extremities. An overnight oximetry done on February 22, 2006 demonstrated

hypoxemia with low oxygen saturation of 71%.  Dr. Henson assessed Plaintiff to have chronic

anxiety disorder, obstructive lung disease, asthmatic bronchitis, obesity, obstructive sleep apnea,

and cor pulmonale. He prescribed Advair, Pulmicort, Musinex, Ketec, and Nasonex; ordered a

chest x-ray; and made a follow-up appointment (Tr. 374-376).  Dr. Henson completed a

pulmonary residual functional capacity evaluation on August 19, 2006, in which he opined

11

Plaintiff was restricted to sitting about 4 hours, walking and standing less than 2 hours, and occasional lifting less than ten pounds. He opined that she should avoid all exposure to extreme heat, high humidity, fumes, odors, dusts, gases, soldering fluxes, solvents, cleaners, and chemicals (Tr. 362-367).

<u>Analysis</u>

Plaintiff moves the Court to reverse the Commissioner's Decision and award benefits or grant remand under sentence four of 42 U.S.C. § 405(g) because the ALJ (1) failed to give appropriate weight to the opinions of Dr. Watterson and Dr. Henson, Plaintiff's treating physicians, and (2) erred in finding Plaintiff's subjective complaints of disabling pain unsupported by the record.

On a Medical Source Statement completed on January 10, 2008, Dr. Watterson reported that Plaintiff had limitation of motion in joints, inability to ambulate effectively, and inflammation in both knees and her spine. He reported that she had significant fatigue and malaise, that she could stand 15 minutes at a time, sit 15 minutes at a time, work 4 hours per day lifting 10 pounds occasionally, should never bend or stoop, and could occasionally raise her arms above shoulder level. He based his restrictions primarily on fibromyalgia[5] but indicated that she

---

[5] **FIBROMYALGIA**

A group of common nonarticular rheumatic disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft-tissue structures. These may be primary and generalized or concomitant with another associated or underlying condition, or localized and often related to overuse or microtrauma factors.

The term **myalgia** indicates muscular pain. In contrast, **myositis** is due to inflammation of muscles tissues and is an inappropriate term for fibromyalgia, when such inflammation is absent. **Fibromyalgia** indicates pain in fibrous tissues, muscles, tendons, ligaments, and other "white" connective tissues. Various combinations of these conditions may occur together as muscular rheumatism. Any of the fibromuscular tissues may be involved, but those of the occiput, low back **(lumbago)**, neck **(neck pain or spasm)**, shoulders, thorax **(pleurodynia),** and

thighs **(aches and charley horses)** are especially affected. There is no specific histologic abnormality, and the absence of cellular inflammation justifies the preferred terminology of fibromyalgia rather than the older terms of fibrositis or fibromyositis.

### Etiology

The condition occurs mainly in females, may be induced or intensified by physical or mental stress, poor sleep, trauma, exposure to dampness or cold, and occasionally by a systemic, usually rheumatic, disorder. A viral or other systemic infection (eg, Lyme disease) may precipitate the syndrome in an otherwise predisposed host. **The primary fibromyalgia syndrome (PFS)** is particularly likely to occur in healthy young women who tend to be stressed, tense, depressed, anxious, and striving, but may also occur in adolescents (particularly girls) or in older adults, often associated with unrelated minor changes of vertebral osteoarthritis. A minority of cases may be associated with significant psychogenic or psychophysiologic manifestations. Symptoms can be exacerbated by environmental or emotional stress, or by a physician who does not give proper credence to the patient's concerns and discharges the matter as "all in the head."

### Symptoms, Signs and Diagnosis

Onset of stiffness and pain frequently are gradual, diffuse, and of an "achy" character in PFS. In localized form, symptoms are more often sudden and acute. The pain is aggravated by straining or overuse. Tenderness may be present, usually localized in specific small zones; ie, "tender points." There may be local tightness or muscles spasm, though active contractions typically cannot be demonstrated by electromyography. Inflammation is not characteristic and only occurs with an underlying systemic condition. **Diagnosis of PFS** is by recognition of the typical pattern of diffuse fibromyalgia and nonrheumatic symptoms (eg, poor sleep, anxiety, fatigue, irritable bowel symptoms) and by exclusion of significant contributory or underlying disease (eg, generalized OA, RA, polymyositis, polymyalgia rheumatica, or other connective tissue disease), and (most difficult of all) exclusion of psychogenic muscle pain and spasm. Fibromyalgia associated with such disorders (ie, concomitant or secondary fibromyalgia) manifests musculoskeletal symptoms and signs similar to PFS (except for psychogenic rheumatism), but requires differentiation from PFS to allow identification and treatment of both the underlying disorder and the fibromyalgia itself. PFS, lime irritable bowel syndrome, is a well-defined dysfunctional entity, readily diagnosed by its characteristic manifestations and by screening tests to exclude underlying conditions. Occult rheumatic disease and hypothyroidism in the middle-aged female should be excluded. Screening tests are normal. Nonspecific and mild histopathologic changes may be present in the muscles, but similar changes are also found in normal control subjects.

### Prognosis and Treatment

Fibromyalgia may remit spontaneously (in milder cases) with decreased stress but can become chronic or recur at frequent intervals. Relief may be obtained from important supportive measures, such as reassurance and explanation of the benign nature of the syndrome, as well as

did have arthritis in her knees and spine (Tr. 203-205).

Dr. Henson treated Plaintiff in 2006 for chronic obstructive pulmonary disease (COPD) and obstructive sleep apnea and found nocturnal hypoxia of 71%. Dr. Henson restricted Plaintiff to less than sedentary work (Tr. 362-367).

Plaintiff argues both doctors performed objective testing confirming their diagnosis and had the opportunity to treat Plaintiff over a sustained period and have an informed opinion of her restrictions.

In discussing the medical evidence, the ALJ made the following statements concerning a physician's motives in completing a medical assessment:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

Tr. 20.

---

stretching exercises, improved sleep, local applications of heat, gentle massage, and low-dose tricyclic agents at bedtime (eg, amitriptyline 10 to 25 mg) to promote deeper sleep. Aspirin 650 mg orally q 3 to 4 h or other NSAIDs in full dosages have not been shown to be effective in clinical trials but may help individual patients. Incapacitating areas of focal tenderness may be injected with 1% lidocaine solution, 1 or 2 mL alone or in combination with a 40-mg hydrocortisone acetate suspension (using the technique described for soft tissue injection in the treatment of chronic low back pain, above). A tricyclic antidepressant drug should be used in the lowest effective dose and may be continued indefinitely with monitoring of side effects, if any. If drowsiness occurs with one product, an alternative (in low dose) may be prescribed. Functional prognosis is usually favorable with a comprehensive, supportive program, although some degree of symptoms tends to persist. *The Merck Manual*, Sixteenth Edition, pp. 1369-1371.

Plaintiff argues these statements indicate a level of suspicion with regard to the assessments of treating physicians that would bias the ALJ against such reports. I agree with Plaintiff. It is inappropriate for the ALJ to always make a general assumption that a doctor would complete an inaccurate medical assessment at the request of the patient, but the ALJ does note this conclusion would be reached only when the physician's opinion departs substantially from the rest of the evidence. In this case, however, I conclude there is little evidence to support such a finding. The only other evidence to contradict the two arguably disabling opinions of the treating physicians is found in the two earlier opinions of the consultative physician and the non-examining State Agency Physician who gave their opinions before the disabling assessments of the two treating physicians.

Fibromyalgia, or fibrositis as it is also referred to, presents unique challenges to the ALJ and the Commissioner because there are no objective medical tests which can assess the severity of the disease or even its very existence. In order to diagnose the disease, a physician must perform tests to rule out other diseases and rely upon subjective symptoms related to the physician by the patient. *See* footnote 1, *supra*. The Sixth Circuit in *Preston v. Sec'y of Health and Human Servs*., 854 F.2d 815 (6th Cir. 1988), discusses the anomalies of this disease:

> ... fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, *physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients*. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Id.* at 817 (emphasis added.)

> Our task in reviewing this issue is complicated by the very nature of fibrositis. Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.

*Id.* at 818.

In *Preston*, the onset date of disability was in dispute. The plaintiff in *Preston* asserted she became disabled by fibrositis in May 1983 while the Secretary of Health and Human Services asserted the plaintiff did not become disabled until March 1986. The plaintiff's treating physician, Dr. Crabbs, opined the plaintiff was disabled prior to March 1986. The Secretary argued Dr. Crabbs could not be relied upon because there was no objective medical evidence to support Dr. Crabbs' opinion. The Sixth Circuit rejected this argument stating:

> Although the opinion of a treating physician, when supported by medical evidence, is entitled to substantial weight in determining disability, *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986), the Secretary argues that such medical evidence is lacking to support Dr. Crabbs' opinion. The Secretary also cites the fairly normal clinical and test results obtained by Drs. Kramer and Bridwell which do not correlate with a disabling disease. However, the CT scans, X-rays, and minor physical abnormalities, noted by these doctors and cited by the Secretary as substantial evidence of no disability before March 26, 1986, are not highly relevant in diagnosing fibrositis or its severity. ***As noted in the medical journal articles in the record, fibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion. Thus, the standard clinical tests and observations conducted by Drs. Bridwell and Kramer to detect neurological and orthopaedic disease were of little aid or relevance in the diagnosis of Preston's disabling fibrositis, except as a means of excluding certain neurologic or orthopaedic causes of her pain.*** In other words, the findings of Drs. Bridwell and Kramer are not substantial evidence that Preston's fibrositis is not disabling.

*Id.* at 819-820 (emphasis added.)

16

The Sixth Circuit has revisited this issue in *Rogers v. Comm'r of Social Security*, 486 F.3d 234 (6th Cir. 2007. In *Rogers*, the Court again recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Id.* at 243 (citing *Preston*, 854 F.2d at 820). As in both *Preston* and *Rogers*, the ALJ's decision here dismisses or minimizes plaintiff's fibromyalgia, found to be severe by her treating physician, a rheumatologist. As noted in *Preston* and *Rogers*, fibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion. The Court in *Preston* discussed fibromyalgia and notes that physical exams will usually yield normal results - a full range of motion, no joint swelling as well as normal muscle strength and neurological reactions. *Preston,* 854 F.2d at 817 .

As stated above, the evidence in the record which contradicts the consistent opinions of the treating and examining physicians is found in the consultative report of Dr. Surber, a consulting physician, who did not have before him either the medical records or the later obtained, disabling opinions of two treating physicians (Tr. 446-451 and 452-456). The non-treating, non-examining physician (the State Agency Physician) also did not have the entire record available at the time of his opinion and appears to have relied heavily on the assessment of the consultative physician (434-439). Under these circumstances, I must respectfully conclude that the consulting physician's opinion and the opinion of the State Agency physician are entitled to little weight.

Next I will turn to the Plaintiff's second issue, that the ALJ erred in finding Plaintiff's subjective complaints of disabling pain unsupported by the record. In reaching his conclusion, the ALJ stated:

17

The claimant's reported daily activities are not suggestive of a totally disabled individual. On a function report the claimant reported she paid bills, cared for her pet, watched television, grocery shopped, visited family members, attended church, and performed light housekeeping and cooking. The claimant's mother and husband reported on a third party function report that the claimant did housework, watched television, prepared simple meals, read the bible [sic], did laundry, shopped, paid bills, visited, cared for and played with her dog, and attended church. The claimant testified she will watch a grandchild on Saturday, if her husband is home.

The claimant has also been diagnosed with obesity, with a height of 66 inches, weight of 232 pounds, and a body mass index greater than 35. The undersigned has considered the impact obesity has at steps two through five of the sequential evaluation, singly and in combination with her other impairments. Consideration included determination of the extent and severity of the claimant's impairment-related limitations, consistent with Social Security Ruling 02-1p.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Tr. 20-21.

20 C.F.R. § 404.1529(c)(3) explains the procedures for evaluating symptoms and credibility of a claimant. The Commissioner has issued *Social Security Ruling* 96-7p, setting out in greater detail the methodology for evaluating symptoms and assessing a plaintiff's credibility. This ruling emphasizes in subpart 4 the following points:

4. In determining the credibility of the individual's statements, the adjudicator **must consider the entire case record,** including the objective medical evidence, the **individual's own statements** about symptoms and how they affect the individual, and **any other relevant evidence in the case record.** An **individual's statements** about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work **may not be disregarded solely because they are not substantiated by objective medical evidence.**

(emphasis added).

18

In this case, the ALJ finds "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 20, 21). Plaintiff argues the ALJ erred in rejecting Plaintiff's subjective complaints of pain noting that under the *Duncan* test, analysis of a claimant's assertions of pain requires a two-pronged test: First, it must be determined "whether there is objective medical evidence of an underlying medical condition." *Duncan v. Sec'y of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). If there is such a condition, a determination must be made as to whether *either* (1) "objective medical evidence confirms the severity of the alleged pain arising from the condition" or (2) the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* In conjunction with the second prong of the analysis, 20 C.F.R. section 416.92(c)(2) sets out a list of factors to be used in evaluating a claimant's symptoms.

Plaintiff argues she satisfies the first prong of the *Duncan* test because there is objective medical evidence of an underlying medical condition. In this case the ALJ found Plaintiff had fibromyalgia, osteoarthritis, chronic obstructive pulmonary disease, asthmatic bronchitis, and obstructive sleep apnea. (Tr. 16). 20 C.F.R. section 416.929(c)(2) defines "objective medical evidence" as evidence obtained from medically acceptable clinical and laboratory diagnostic techniques, including "evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." Thus, in *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), the court found that the first prong of the analysis was met by evidence of "inflammation of Felisky's pelvic bones, painful tenderness in the muscles throughout the pelvic area, degenerative joint disease, and

limitations in lumbar motion." In Plaintiff's case, the medical evidence includes clinical findings of degenerative disc disease of the thoracic spine and right knee, and tender points related to fibromyalgia. This evidence is sufficient to establish the presence of an underlying medical condition.

The second prong of the *Duncan* test is met by satisfying one of the alternative parts: objective medical evidence confirms the severity of the alleged pain, or the objectively established medical condition is of a severity that it could reasonably be expected to produce the alleged pain. As pointed out by the court in *Felisky*, these alternatives are consistent with the relevant regulations, which specify that, "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." *Felisky*, 35 F.3d at 1037-38 (citing 20 C.F.R. § 416.929(c)(2)).

Plaintiff argues the factors set out in 20 C.F.R. § 416.929(c)(3) support Plaintiff's allegations of disabling pain. Plaintiff testified to a very limited range of daily activities. Plaintiff described numbness in her feet when she lies down (Tr. 507). On a scale of 0-10 her pain level is a ten when she wakes up. Her knees hurt from arthritis with activity (Tr. 509). Her knee pain is a level six. She testified she cut her smoking to one-half pack per day (Tr. 510). She still took two 30-45 minute breathing treatments per day (Tr. 511). Although she goes to church she usually does not sit through the whole service (Tr. 517). When her husband takes her on a 45-50 minute trip to Nashville to the doctor she stops and gets out of the vehicle for ten minutes before continuing the trip (Tr. 519).

At 20 C.F.R. § 416.929(c)(4), the regulations indicate that the Social Security Administration will also consider the opinions and statements of the treating physicians and the consistency of the claimant's statements with the other evidence. I conclude Plaintiff's testimony at the hearing is basically consistent with the statements she has given to her treating physicians.

The medical evidence does appear to support Plaintiff's allegations of pain. She has x-ray and MRI evidence of arthritis in her spine and knees and a treating rheumatologist confirming a diagnosis of fibromyalgia, a diagnosis accepted by the ALJ.

In rejecting Plaintiff's allegations concerning her pain (and at several other points during his decision), the ALJ focused upon her level of activity. He concluded her own testimony was consistent with a greater level of activity than would be expected for a disabled person. He stated that, "[o]n a function report the claimant reported that she paid bills, cared for her pet, watched television, grocery shopped, visited family members, attended church, and performed light housekeeping and cooking." (Tr. 20). I disagree with his conclusions. These findings completely ignored limitations on her abilities clearly set out in the record.

Although she goes to church she usually does not sit through the whole service (Tr. 517). When her husband takes her on a 45-50 minute trip to Nashville, Tennessee to see her doctor she stops and gets out of the vehicle for 10 minutes before continuing the trip (Tr. 519). Plaintiff's mother, Carol Green, stated in the same third party function report on November 15, 2004, referred to by the ALJ, that Angela May rests about every 15 minutes and she can only stand or walk for 10 minutes before resting about 20-30 minutes before resuming walking (Tr. 152-159). Moreover, as Plaintiff argues, the Sixth Circuit has held that the ability to do simple activities such as driving, shopping, or sweeping does not necessarily indicate an ability to perform substantial gainful

21

activity when the activities are done on an intermittent basis due to pain. *Walston v. Gardner*, 381 F.2d 580 (6th Cir. 1967).

I conclude the medical evidence as a whole is consistent with Plaintiff's testimony and supports Plaintiff's complaints of disabling pain. I do not agree with the ALJ's assessment that her reported daily activities are not suggestive of a totally disabled individual (Tr. 20). That conclusion can be supported only by accepting part and not the whole of the testimony of Plaintiff and Plaintiff's mother and husband. The opinion of the two treating physicians indicates the presence of disabling impairments (Tr. 192-195). Both *Preston* and *Rogers* instruct us that the nature of fibromyalgia is such that objective evidence generally is not available to confirm its diagnosis or its debilitating effects. I conclude there is not substantial evidence to support the ALJ's credibility assessment.

Having concluded the ALJ's decision is not supported by substantial evidence, I must now address the next course to take. When the ALJ's findings are not supported by substantial evidence or are legally unsound, the reviewing court should reverse and remand the case for further administrative proceedings unless "the proof of disability is overwhelming or . . . the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Having considered the record carefully, I conclude that proof of disability is strong; however, evidence to the contrary is *not* lacking. There is some minimal evidence to support the Commissioner's decision, but, for the following reasons, the record is insufficient to affirm the Commissioner's decision.

There is evidence in this record to establish the existence of fibromyalgia and COPD and two treating physicians have given opinions which are arguably disabling. The only evidence to

22

the contrary, but it is to the contrary, comes from the assessments of the examining, consulting physician and the non-examining State Agency Physician. Because their opinions were made without the benefit of the disabling opinions later given by the treating physicians and because I conclude the credibility assessment is flawed, the proper remedy is to remand the case to the Commissioner so that additional evaluations can be made of the medical record as a whole to determine if Plaintiff is disabled and if so, to determine the appropriate onset date.

Conclusion

I conclude the Commissioner's decision is not supported by substantial evidence. Proof of disability is strong when one considers all of the credible evidence. However, there is some evidence to the contrary.

Accordingly I RECOMMEND that:

1.     Plaintiff's motion for judgment on the pleadings (Doc. 12) be GRANTED to the extent plaintiff seeks remand under Sentence Four of 42 U.S.C. § 405(g) and be DENIED to the extent plaintiff seeks reversal and an award of benefits;

2.     Defendant's motion for summary judgment (Doc. 17) be DENIED; and

3.     The Commissioner's decision denying benefits be REVERSED and REMANDED[6] pursuant to Sentence Four of 42 U.S.C. § 405(g) for further evaluation consistent with this opinion. Plaintiff shall be allowed to present such additional medical evidence as may be available.

Dated:  December 30, 2009                     s\William B. Mitchell Carter
                                              UNITED STATES MAGISTRATE JUDGE

---

[6]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).